**06 CV 4024**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOSEPH ANASTASIO, JULIA
ILYUTOVICH, TYLER MASTERSON,
EMILY ROSENBERG, AND BRIAN
RUARK, individually and on behalf of all
others similarly situated,

                          Plaintiffs,

    -against-

CANON U.S.A., INC. and
CANON, INC.,

                          Defendants.

**JURY TRIAL DEMANDED**

U.S. DISTRICT COURT
S.D.N.Y.
06 MAY 25 PM 8:36
RECEIVED

## CLASS ACTION COMPLAINT

Plaintiffs, Joseph Anastasio, Julia Ilyutovich, Tyler Masterson, Emily Rosenberg, and

Brian Ruark ("Plaintiffs"), by and through their undersigned attorneys, hereby complain against

Canon U.S.A., Inc. and Canon, Inc. ("CUSA" and "Canon", respectively, and collectively, the

"Defendants") on behalf of themselves and all others similarly situated as follows. Plaintiffs'

allegations are based upon information and belief, except as to their own actions, which are

based on knowledge. Plaintiffs' information and belief are based on the investigation of their

counsel.

<u>OVERVIEW</u>

1.    Plaintiffs have filed this class action, on behalf of themselves and all others similarly situated to obtain damages, restitution, and injunctive relief for the Class (as defined below) from Defendants.

2.    As alleged more fully herein, Defendants engaged in deceptive acts and practices, breached the implied warranty of merchantability, failed to disclose the defective nature of the Cameras (as defined herein), and consequently were unjustly enriched by selling the Cameras.

3.    Though faced with mounting consumer complaints concerning the Cameras, Defendants have failed and refused to remedy the defects inherent in all of the Cameras.

4.    Furthermore, although the defective Cameras are sold with a one-year limited warranty, Defendants charge purchasers of the defective Cameras a **REDACTED** repair fee ranging from $50.00 to $175.00 to repair the Cameras for claims falling outside the limited warranty. Additionally, Defendants have an "upgrade" program, whereby Defendants will "upgrade" the Cameras with a refurbished Camera for an additional sum of money if consumers agree to return their defective Cameras. As a result, Defendants further profit from the sale of defective Cameras by charging consumers high "repair" or "upgrade" fees.

5.    Plaintiffs seek actual damages and equitable relief, including the replacement and/or recall of the Cameras, civil penalties, costs and expenses of litigation, including attorneys' fees, and all other relief the Court deems appropriate.

## **THE PARTIES**

6.    Plaintiff Joseph Anastasio is a citizen and resident of the State of Connecticut. Plaintiff Anastasio purchased a Canon PowerShot A70 Camera in February 2004. Plaintiff

2

Anastasio's Canon PowerShot A70 model camera is equipped with a defective CCD sensor, which is defective for the reasons set forth in ¶¶ 39 - 76 herein. Plaintiff Anastasio's A70 ceased functioning in April 2005 after his A70 displayed an E-18 error on its LCD screen. Plaintiff Anastasio notified CUSA of the E-18 defect and his A70 was repaired at no charge to Mr. Anastasio. In December 2005, Plaintiff Anastasio's A70 again ceased functioning after the A70 once again displayed another E-18 error on the LCD screen. Plaintiff Anastasio again notified CUSA of the E-18 defect. This time, CUSA offered Plaintiff Anastasio the option of either having his A70 repaired or upgraded. Plaintiff Anastasio paid $102.82 to Defendants in order to have his A70 repaired.

7.    Plaintiff Julia Ilyutovich is a citizen and resident of the State of New Jersey. Plaintiff Ilyutovich purchased a Canon PowerShot S400 Camera in June 2003.    Plaintiff Ilyutovich's S400 ceased functioning in August 2004 after her S400 displayed an E-18 error on its LCD screen. Notice of the E-18 defect was given to CUSA on Plaintiff Ilyutovich's behalf in or about September 2004.

8.    Plaintiff Tyler Masterson is a citizen and resident of the State of Illinois. Plaintiff Masterson purchased a Canon PowerShot SD200 Camera in June of 2005. Plaintiff Masterson's SD200 ceased functioning on August 13, 2005 after the LCD screen on his SD200 cracked.

9.    Plaintiff Emily Rosenberg is a citizen and resident of the State of New York. Plaintiff Rosenberg purchased a Canon PowerShot SD200 Camera on May 17, 2005. Plaintiff Rosenberg's Canon PowerShot SD200 Camera ceased functioning on August 28, 2005 after the LCD screen on her SD200 cracked.

10.     Plaintiff Brian Ruark is a citizen and resident of the State of Wisconsin. Plaintiff Ruark purchased a Canon PowerShot A60 Camera on or about June 21, 2003. Plaintiff Ruark's Canon PowerShot A60 model camera is equipped with a defective CCD sensor, which is defective for the reasons set forth in ¶¶ 39 - 76 herein. Plaintiff Ruark's A60 ceased functioning on September 30, 2005, after his A60 displayed an E-18 error on its LCD screen.

11.     Defendant Canon, Inc. is a corporation organized under the laws of Japan with its principal place of business located at 30-2, Shimomaruko 3-chome, Ohta-ku, Tokyo 146-8501, Japan. Canon is engaged in the design, manufacture and sale of digital cameras as well as office and other consumer imaging equipment, throughout the world. Canon defectively designed the Cameras as set forth in detail below.

12.     Defendant Canon U.S.A., Inc. is a corporation organized under the laws of the State of New York with its principal place of business located at 1 Canon Plaza, Lake Success, New York, 11042. CUSA is engaged in the marketing and sale of consumer products, including digital cameras, throughout the United States. Defendant CUSA is a wholly-owned subsidiary of Canon Inc.

## JURISDICTION AND VENUE

13.     This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and some members of the proposed Class are citizens of a state different from that of Defendants CUSA and Canon.

14.     Venue is proper in this District under 28 U.S.C. § 1391. CUSA and Canon, by and through the activities of its wholly-owned subsidiary CUSA, conduct substantial business

activity, including advertising, marketing, distribution, and the sale of Cameras, at locations throughout this District.

## CLASS ACTION ALLEGATIONS

15.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all others similarly situated who, during the period October 1, 2002 through May 25, 2006 (the "Class Period"), purchased any of the cameras included in any of the following three subclasses.

16.    Plaintiffs Joseph Anastasio and Brian Ruark bring this class action on behalf of themselves and all those who purchased a: (i) a Canon PowerShot A60 model camera; (ii) a Canon PowerShot A70 model camera; (iii) a Canon PowerShot Model A75 model camera; (iv) a Canon PowerShot S230 model camera; (v) a Canon PowerShot SD110 model camera; (vi) a Canon PowerShot SD100 model camera; (vii) a Canon PowerShot A300 model camera; or (viii) a Canon PowerShot A310 model camera (the "CCD Defect Cameras" and the "CCD Defect Subclass" respectively).

17.    Plaintiffs Masterson and Rosenberg bring this class action on behalf of themselves and all others who purchased a Canon PowerShot SD200, SD300, SD400 or SD500 model camera (the "SD Defect Cameras" and the "SD Defect Camera Subclass," respectively).

18.    Plaintiffs Anastasio, Ilyutovich and Ruark bring this class action on behalf of themselves all others who purchased: (i) a Canon PowerShot S400 model camera manufactured prior to June 9, 2003; (ii) a Canon PowerShot A60 model camera manufactured prior to June 10, 2003; or (iii) a Canon PowerShot A70 model camera manufactured prior to June 10, 2003 (the "E-18 Defect Cameras" and the "E-18 Defect Subclass" respectively).

19.    The CCD Defect Cameras, SD Defect Cameras, and E-18 Defect Cameras, are collectively referred to as the "Cameras." The CCD Defect Subclass, SD Defect Subclass, and E-18 Defect Subclass are collectively referred to as the "Class."

20.    The members of the Class are so numerous that joinder of all members would be impracticable. Based on the information provided in the Canon PowerShot Repair Reports, Plaintiffs estimate that the: (i) CCD Defect Subclass is comprised of at least REDACTED subclass members; (ii) SD Defect Subclass is comprised of at least REDACTED subclass members, and (iii) E-18 Defect Subclass is comprised of at least REDACTED subclass members, resulting in an aggregate of at least REDACTED Class members.

21.    There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

a.    Whether the Cameras are defective;

b.    Whether Defendants were aware of the defects inherent to the Cameras;

c.    Whether the Cameras were of merchantable quality at the times they were sold;

d.    Whether the defects inherent in the Cameras caused the Cameras to be non-merchantable at the times they were sold;

e.    Whether Defendants breached the implied warranty of merchantability to the Class by selling non-merchantable Cameras;

f.    Whether Defendants were unjustly enriched by sales of defective Cameras;

g.    Whether failing to disclose the defects inherent in the Cameras, a material fact of which Defendants were aware, constitutes a deceptive trade practice;

h.    Whether the sale of defective Cameras constitutes a deceptive trade practice;

i.   Whether, as a result of Defendants' misconduct, Plaintiffs and members of the Class are entitled to damages, equitable relief and/or other relief, and the amount and nature of such relief;

j.   Whether the CCD Defect Cameras, SD Defect Cameras, or E-18 Defect Cameras are defective;

k.   Whether Defendants were aware of the defects inherent in the CCD Defect Cameras, SD Defect Cameras, or E-18 Defect Cameras;

l.   Whether Defendants breached the implied warranty of merchantability by selling non-merchantable CCD Defect Cameras, SD Defect Cameras, or E-18 Defect Cameras;

m.   Whether Defendants were unjustly enriched by the sales of the CCD Defect Cameras, SD Defect Cameras, or E-18 Defect Cameras;

n.   Whether failing to disclose the defect inherent in the CCD Defect Cameras, SD Defect Cameras, or E-18 Defect Cameras, a material fact of which Defendants were aware, constitutes a deceptive trade practice;

o.   Whether the sale of defective CCD Defect Cameras, SD Defect Cameras, or E-18 Defect Cameras constitutes a deceptive trade practice; and

p.   Whether, as a result of Defendants' misconduct, Plaintiffs and members of CCD Defect Subclass, SD Defect Subclass, or E-18 Defect Subclass are entitled to damages, equitable relief and/or other relief, and the amount and nature of such relief.

22.   The claims of Plaintiffs are typical of the claims of the Class because Plaintiffs, like all members of the Class, unknowingly purchased defective Cameras. Plaintiffs have no interests antagonistic to those of the Class, and CUSA and Canon have no defenses unique to Plaintiffs.

23.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained attorneys experienced in class and complex litigation.

24.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

a.  It is economically impractical for members of the Class to prosecute individual actions because the damages suffered by each Class member may be relatively small, thus the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous;

b.  The Class is readily ascertainable and definable; and

c.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

25.  Plaintiffs do not anticipate any difficulty in the management of this litigation.

## SUBSTANTIVE ALLEGATIONS

### The Digital Camera Market

26.  According to a study published by InfoTrends/CAP Ventures in December 2004, worldwide digital camera revenue was forecast to reach $24 billion in 2004, and grow to $31 billion in 2009. The top three regions for digital camera sales in 2004 were Europe, the United States and Japan.

27.  Canon made its debut in the digital camera market in July of 1996 when it introduced the PowerShot 600. To date, Canon has released more than 50 additional PowerShot digital models.

28.  Notably, in February 2003, Canon announced the introduction of five new PowerShot Cameras. In a press release Canon stated, "[t]he introduction of five new PowerShot digital cameras is one of the most aggressive product announcements Canon has made in recent memory, and a clear indication of our desire to become the preferred brand of digital cameras among consumers."

29.    On or about April 3, 2003, the New Straits Times Press (Malaysia) ITP reported that "Canon Marketing's President and Chief Executive Officer Satoshi Kimura said that . . . `[c]urrently, Canon is one of the leaders in the digital camera market with 24 per cent market share.'"

30.    According to Form 20-F/A filed by Canon, Inc. on December 22, 2004, with the introduction of six new PowerShot Cameras in 2003, Canon "finally reached the top position in the industry, in unit sales basis."

**A Primer On Digital Camera Technology**

31.    Digital cameras differ from traditional cameras in that they replace film with an image sensor and digital image processor that capture light on the small photosites on the image sensor's surface and convert that light into electronic signals to record images as digital data.

32.    The lens of a digital camera gathers light and forms an image on the image sensor.

33.    Specifically, the image sensor is comprised of a collection of tiny light-sensitive diodes, which accumulate electrical charges (electrons) when they are hit with light particles (photons). These diodes are called photosites. Each photosite is sensitive to light -- the brighter the light that hits a single photosite, the greater the electrical charge that will accumulate at that site.

34.    The digital image processor converts the electronic color signals from the image sensor into digital signals.   More technically, the image sensor converts the image from light waves into an analog electrical signal.  The analog signal is then run through an analog to digital converter (A-D Converter), where it becomes a pure digital signal.  Then it is again put through a series of electronic filters that adjust the white balance, color, and aliasing of the image.

35.    The amount of detail that the camera can capture is called the resolution, and it is measured in picture elements known as pixels, which are laid out in an array with rows and columns. The more pixels the camera has, the more detail it can capture.

36.    If necessary and depending on image size and compression ratio chosen by the user, a compression algorithm stipulated under the JPEG format is used to shrink the image for more efficient storage.

37.    The image is then written out to a memory card.

38.    Figure 1 below identifies some of the elements of a Canon-brand digital camera.

**Figure 1**



## THE CCD DEFECT CAMERAS

### How A "Charged Couple Device" or "CCD" Sensor Functions

39.    Instead of film, the Cameras are manufactured with a sensor that converts light into electrical charges.  The image sensor used by Canon in the Cameras is known as a "charged coupled device" or "CCD" sensor.  A CCD sensor converts light into electrons.  Once the sensor converts light into electrons, it reads the value (accumulated charge) of each cell in the image. A CCD sensor transports the charge across the chip and reads it at one corner of the array.  An analog-to-digital converter (ADC) then turns each pixel's value into a digital value by measuring the amount of charge at each photosite and converting that measurement to binary form.

40.    According to a document entitled, *"Canon Technology Highlights 2005,"* "Canon's proprietary Digital Imaging Processor is a core device in [Canon] cameras. . . . **Most of the functions required to process signals in a digital camera are condensed on this single chip,** which measures a mere 10 mm square.  Light passing through [the Cameras'] lens is gathered by the CCD as electric charges and converted to electronic signals.  By itself the CCD is incapable of color perception, so it obtains color data via a color filter arranged above individual pixels.  Image data gathered by the CCD is converted to digital signals using an A/D (analog/digital) converter.  Once converted, the data is processed by the digital signal processing circuits and recorded onto a Compact Flash memory card." (Emphasis added).

**The CCD Sensors That Canon Used In Designing and
Equipping The A60, A70, A75, S230, SD100, SD110,
A300 and A310 model PowerShot Cameras Were Defective**

41.    Canon designed and equipped all of Canon's A60, A70, A75, S230, SD110,

SD100, A300 and A310 model PowerShot Digital cameras using defective CCD sensors

manufactured by Sony, Inc. ("Sony").

42.    REDACTED

43.    As a result of the CCD defect, purchasers of the CCD Defect Cameras began

experiencing problems with the images displayed on the LCD Screens of the CCD Defect

Cameras. Particularly, images failed to appear or appeared with extreme distortion and/or with

severe purple or green color casts. Accordingly, purchasers of the CCD Defect Cameras

began to complain about their cameras. Based on the large number of complaints that

Defendants had received regarding the CCD Defect Cameras, Canon launched an

investigation into the cause(s) of these customers' complaints. REDACTED (annexed as

Exh. 1 hereto).

44.    The December 27, 2004 memorandum prepared by REDACTED and states in

relevant part:

REDACTED

\*        \*        \*

REDACTED

\*        \*        \*

REDACTED

REDACTED

(Emphasis added).

45.    REDACTED

46.    REDACTED  This series of emails provides a remarkable insight into Canon's knowledge concerning the CCD Defect. In particular, these emails reveal that Mr. Nakai REDACTED (See Exh. 2 hereto). (Emphasis added).

47.    On or about August 30, 2005, Sony Corporation's Management & Quality Division provided Canon with a report entitled, REDACTED (annexed as Exh. 3 hereto).

REDACTED

REDACTED

\*      \*      \*

REDACTED

\*      \*      \*

REDACTED

(Emphasis added).

48.    REDACTED (Emphasis added).  This September 2, 2005 email further REDACTED

49.    On October 4, 2005, Canon's "ICP QA Center" authored a document entitled, REDACTED

\*      \*      \*

REDACTED

**Despite Having Knowledge Of The CCD Defect, Defendants Did
Not Act To Inform CCD Defect Subclass Members Of Its'
Existence Until After Sony Had Publicly Disclosed The Defect
and Defendants Then Misled CCD Defect Subclass Members
About The Scope Of The CCD Defect**

50.    CUSA's Director and Assistant General Manager for Camera and Video Repair,

Larry Hardin, recently testified that it was his opinion that, when Canon discovered a defect in

one or more of Defendants' products, the "right thing to do" was to "admit a problem and fix

it." (Hardin Tr. pp. 140-141). A review of the following facts, however, makes clear that while

Mr. Hardin may have believed that the right thing to do was to "admit a problem and fix it," –

neither he nor Defendants practiced this belief.

51.    For example, despite Canon having had knowledge of the existence of the CCD

defect for many months, as confirmed by Exhibit 1 hereto, Defendants waited at least ten

months before acting to notify any members of the CCD Defect Subclass – and then only did so

after Sony had issued a public announcement about the defective CCD sensors.

REDACTED (See Exh. 4 hereto)

52.    When Mr. Hardin was asked during his deposition whether he could "think of

any reason that, once Canon itself learned of the defective CCD issue, why Canon was required

to wait for anybody to announce anything about the defective CCD issue to its own customers

on Canon's own website?," Mr. Hardin answered, "I guess I would have to answer truthfully

right now I can't think of a reason. There might be one, but I can't think of one." (Hardin Tr.

pp. 244-245).

53.    On October 6, 2005, CUSA ultimately posted an announcement to its web site

disclosing the existence of the previously known CCD defect in Canon PowerShot A60, A70,

14

A75, S230, SD110, SD100, A300 and A310 model cameras -- a fact that had long been known to Defendants but not to members of the CCD Defect Subclass.

54.    Apparently unhappy about having their hand forced into making an announcement concerning the defective CCD sensors by virtue of Sony's decision to go public about the CCD defect, Defendants acted to avoid repairing as many of the more than **REDACTED** defective Cameras as possible. This fact is confirmed by several documents produced by Defendants.

55.    **REDACTED** (See Exh. 5 hereto).

56.    **REDACTED**  One need only view the CUSA website to understand the full significance of this instruction. An entire one third of the home page of the CUSA website (the very first page a viewer sees when logging onto the CUSA website) bears the heading "Canon News" and is exclusively devoted to important news involving Canon products and is perpetually updated. Rather than posting the announcement concerning the defective CCD sensors to this portion of the CUSA website, Defendants deliberately instructed that the notice be posted on the "Support" pages only of the CUSA website, thereby requiring a CCD Subclass member to drill through four layers of the CUSA web site in order to find news about the CCD defect.

57.    Moreover, even if CCD Defect Subclass member were able to finally locate news concerning the CCD defect in an obscure location on the CUSA website and learned that they indeed owned one of the cameras that was equipped with a defective CCD sensor, they encountered the following "Service Notice" which stated in relevant part:

> It has recently come to our attention that the vendor-supplied CCD image sensor used in this Canon digital camera may cause the following malfunction: When

15

the product is used in recording or playback mode, the LCD screen and/or electronic viewfinder may exhibit either a distorted image or no image at all. . . .

\*      \*      \*

Effective immediately, and regardless of warranty status, **Canon will repair, free of charge, products exhibiting the above-mentioned malfunction if the malfunction is caused by the CCD image sensor.** . . .

58.    As demonstrated by the foregoing Service Notice, and notwithstanding Defendants' knowledge that all of the Canon PowerShot A60, A70, A75, S230, SD110, SD100, A300 and A310 model cameras are defective because they are all equipped with the defective CCD sensors, Defendants have wrongfully refused to repair all of these defective Cameras, opting instead to repair, at Defendants' expense, only those cameras that have exhibited the blank or blurried LCD screen image symptoms that result from the CCD Defect.

59.    REDACTED Mr. Hardin did not deny that Defendants had tried to avoid repairing these REDACTED defective Cameras at Defendants' expense.  Rather, he testified as follows:

Q.    Why would Canon ever seek to avoid performing a free repair on CCD, defective CCD cameras, in your understanding?

A.    I don't know.

Q.    Do you believe that Canon would seek to avoid performing free repairs or repairs that were free to consumers for defective CCD cameras?

A.    I have to say -- I honestly have to say I don't know.

(Hardin Tr. pp. 242).

60.    REDACTED

61.    REDACTED

16

*        *        *

62.    REDACTED

(See Exh. 6 hereto)(Bold in original, Bold with underline added).

63.    REDACTED (See Exh. 7)

64.    Rather than acknowledge what Defendants had long known – namely that more

than REDACTED Canon PowerShot A60, A70, A75, S230, SD110, SD100, A300 and A310

model cameras were each equipped with defective CCD sensors, and that these cameras were

themselves, therefore defective, Defendants opted instead to mislead CCD Defect Subclass

members by telling them that REDACTED

65.    At the time Defendants made these false statements, Canon was aware (because

Canon had been provided with a copy of Sony's August 30, 2005 report entitled,

REDACTED

66.    Similarly, while Defendants were publicly falsely proclaiming, REDACTED

67.    A memo entitled, REDACTED states in relevant part:

REDACTED

(Emphasis added).

Defendants' observation that the CCD wire bonding defect had become the topic of

considerable discussions on the web was quite correct – as evidenced by the following web

postings:

a.    "Like Everyone else in your reviews, I am having the same blackscreen problem. My
Camera was purchased in the US by my wife as a gift. 15 months later it is a disposable.
Does Canon realize that this will harm their image or is it that they don't care about their
image. I will not be buying another CANON camera nor will I pay over $100 to fix

17

this junk." (http://www.digitalcamera-hq.com/canon-powershot-a70-reviews.html) (emphasis added).

b. **"I came to this site trying to find a way to contact Canon customer service about my camera screen going black the other day. After reading all these posts I see that this is a common problem. I would rather buy a new camera than put another $100 or more into this one.** I think I'll just use the view finder and ignore the screen for now and if and when the camera dies, I'll buy another brand. A two year old camera should not require major repair work!" (http://www.digitalcamera-hq.com/canon-powershot-a70-reviews.html) (emphasis added).

c. "I give this camera a terrible rating simpley [sic.] because when a $350 camera only works for just over a year and a half, that's terrible. **I get the same horizontal lines, black pictures with lines, purple pictures with lines as everyone else.** When it worked it was great, but it looks to me like this camera has a 2 year life span max." (http://www.digitalcamera-hq.com/canon-powershot-a70-reviews.html) (emphasis added)

68.    Moreover, while Plaintiffs anticipate that Defendants will continue to proclaim as they have all along that the repair rates for the PowerShot Camera line was "infinitesimal,"– the reason for these low repair rates is clear from the aforementioned postings.  Aggrieved Class members refuse to pay to have their defective Cameras repaired – choosing, instead, to spend their money on a new camera manufactured by a company other than Canon.  Accordingly, Defendants' reliance on any claimed "infinitesimal" repair rate is misplaced and cannot be used to shield Defendants from liability for having designed, manufactured and sold more REDACTED defective Cameras.

69.    REDACTED

i.    REDACTED A60 and A70 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (see Exh. 8 hereto);

ii.    REDACTED A75 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (see Exh. 9 hereto);

18

iii.    **REDACTED** S230 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (see Exh. 10 hereto);

iv.    **REDACTED** SD100 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (see Exh. 11 hereto);

v.    **REDACTED** SD110 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (see Exh. 12 hereto);

vi.    **REDACTED** A300 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (see Exh. 13 hereto); and

vii.    **REDACTED** A310 model cameras equipped with the defective CCD sensors were introduced into the market and sold to CCD Defect Subclass members during the Class Period (annexed as Exh. 14 hereto).

**Defendants Seek To Avoid Their Responsibility**
**For Repairing More Than REDACTED Cameras**
**Equipped With Defective CCD Sensors At Their Expense**

70.    Despite having: (i) knowledge that all of the Canon PowerShot A60, A70, A75, S230, SD100, SD110, A300, and A310 model cameras are defective because they contain a defective CCD sensor; (ii) caused these defective products to enter the stream of commerce; and (iii) accepted payment for the Cameras when Defendants were, in fact, engaged in the sale of defective cameras, Defendants have not recalled these defective products.

71.    Moreover, although all of the more than REDACTED Canon PowerShot A60, A70, A75, S230, SD110, SD100, A300 and A310 model cameras equipped with these CCD sensors are themselves defective because they are equipped with these defective CCD sensors, Defendants have offered to repair at Defendants' expense, only those REDACTED.

72.    Simply stated, despite Defendants' knowledge that each of the more than REDACTED cameras equipped with these defective CCD sensors are defective, Defendants have wrongfully refused to repair each of the defective cameras that they placed into the stream of commerce – opting instead to drastically limit Defendants' financial exposure by repairing only those Cameras that have REDACTED

73.    Mr. Hardin testified as to the magnitude of the financial burden that Defendants improperly seek to shift onto members of the CCD Defect Subclass. Mr. Hardin stated, "historically a reasonable and customary repair charge" for repairing a Camera with a defective CCD sensor "might be $145 plus tax and shipping that might come to a total of about $170" per defective camera. (Hardin Tr. pp. 222-223). Given that, through November 1, 2005, Defendants had sold approximately REDACTED defective Canon PowerShot A60, A70,

A75, S230, SD100, SD110, A300, and A310 model cameras and repaired only approximately REDACTED of those defective Cameras at Defendants' expense, Defendants successfully avoided repairing REDACTED defective cameras, at a cost ranging from between $145 to $170 per defective Camera.  By their actions, Defendants have been able to wrongfully shift the financial burden of repairing these defective Cameras onto the members of the CCD Defect Subclass in an aggregate amount ranging from REDACTED

74.    In addition, Defendants have further minimized the financial impact on Canon and CUSA by: (i) failing to provide any meaningful notice of the CCD defect to CCD Defect Subclass members; and (ii) not offering refunds to those who had previously paid for repairs and who are readily identifiable from Defendants' Customer Service database.

75.    REDACTED (See Exh. 15 hereto). REDACTED

76.    REDACTED (See Exh. 16 )

**THE DEFECTIVE "SD" MODEL CAMERAS**

77.    The Canon SD200, SD300 and SD400 model cameras comprise the "SD LCD Series Cameras," and the Canon SD200, SD300, SD400 and SD500 model cameras comprise the "SD Memory Card Series Cameras."  The "SD Defect Subclass" includes both the SD LCD Series Cameras and the SD Memory Card Series Cameras.

**SD LCD Series Cameras Are Defectively Designed**

78.    Each of the SD LCD Series Cameras has an LCD screen that is at least 2 inches in diameter.  These screens are used to frame and view a picture before a digital photograph is actually taken.  In addition, the various functions of these Cameras are displayed on the LCD screen for viewing by the Cameras' users.

79.    The SD LCD Series Cameras have been advertised as being ultra compact. The SD LCD Series Cameras are defective, however, because they are all designed and equipped by Canon with LCD screens that are far too fragile based on the design of the main frame member of these Cameras, which has resulted in an exceedingly high number of cracked or broken LCD screens on the SD LCD Series Cameras.

80.    The LCD display assembly of the SD LCD Series Cameras consists of an LCD and back light unit. The LCD, which is approximately REDACTED.

81.    Breakage of the LCD screens in the SD LCD Series Cameras is a common occurrence because REDACTED In light of this design, the LCD screen assemblies on the SD LCD Series Cameras cannot withstand ordinary use and are, therefore, defectively designed.

82.    While the LCD screens in the SD LCD Series Cameras are designed to be much larger than the LCD screens used by Canon in other Canon digital cameras, Canon has not designed or manufactured the LCD screen with materials robust enough to withstand ordinary usage, and has not designed the SD LCD Series Cameras with any protective surface over the LCD that prevents direct contact with external objects.

83.    REDACTED

Figure 1

REDACTED

84.    REDACTED

22

Figure 2

---

REDACTED

---

85.     REDACTED As a result, the LCD screens in the SD LCD Series Cameras

have experienced an extraordinary breakage rate.

REDACTED

86.     The very first page of the "Camera User Guide" for the SD200 and SD300 model

cameras states in relevant part:

Use of genuine Canon accessories is recommended.

**This product is designed to achieve excellent performance optimally when
used with genuine Canon accessories.**

(See Exh. 17 - relevant pages attached hereto)(Emphasis added).

87.     Similarly, the first page of the "Camera User Guide" for the SD400 model

camera states in relevant part:

Use of genuine Canon accessories is recommended.

**This product is designed to achieve excellent performance when used with
genuine Canon accessories.**

(See Exh. 18 - relevant pages attached hereto) (Emphasis added).

88.     Defendants' claims that the SD LCD Series Cameras were designed to achieve

excellent performance when used with genuine Canon accessories is false, as Defendants have

long known.

89.     REDACTED

90.     REDACTED

*          *          *

23

91.    REDACTED

*    *    *

REDACTED

*    *    *

REDACTED

*    *    *

REDACTED

(Emphasis added).

92.    REDACTED  Moreover, the User Manuals do not instruct a user on how to store or insert a Camera into one of these cases, i.e., what constitutes facing "frontward" as opposed to facing "backward," and there is no stated prohibition on storing the Cameras in these cases facing in either direction.  Additionally, the REDACTED soft cases produced by Canon were designed in such a manner that they receive the SD LCD Series Cameras into these cases facing in either direction – "frontward" or "backward."

93.    Accordingly, contrary to Defendants' claim that "this product is designed to achieve excellent performance when used with genuine Canon accessories," the design of the SD LCD Series Cameras is defective.

94.    REDACTED Defendants never acted to notify SD Defect Subclass members of these significant engineering findings.  REDACTED defect, and never eliminated these statements from the "User Manuals" for the SD LCD Series Cameras.

**While Defendants Purportedly Adopted A Policy of Repairing The Cracked LCD Panels In The SD LCD Series Cameras At Defendants' Expense, Defendants Continued To Charge Customers To Repair SD Model Cameras With Cracked LCD Panels**

95.     CUSA's Larry Hardin and Walter Inglsby both testified that, when a PowerShot digital camera is returned to Defendants for repair, Defendants' presume that the LCD panel in that Camera was damaged as a result of impact damage caused by customer abuse, and that Defendants will therefore repair the LCD Panel at the customer's expense. Mr. Hardin further testified that, beginning in March and August of 2005, in situations involving SD200, SD300, and SD400 model Cameras, however, Defendants had adopted a policy that, absent any obvious evidence of abuse by the customer to the Camera, Defendants would repair a cracked LCD panel on the SD200, SD300 and SD400 model Cameras at Defendants' expense – rather than at the customer's expense. (Hardin Tr. pp. 275-277).

96.     Two internal memoranda, entitled REDACTED respectively, confirm the substance of Mr. Hardin's testimony on this subject. Both memoranda state in relevant part: REDACTED (See Exhs. 19 and 20 hereto).

97.     REDACTED (See Exh. 21 hereto)

98.     When asked whether Defendants had taken any action to notify owners of the SD LCD series Cameras about these new policies, Mr. Hardin testified that he did not "recall any action taken by Canon to notify those customers." (Hardin Tr. p. 278).

99.     REDACTED cracked LCD panels, even in these defective cameras after Defendants had purportedly adopted these policies.

100.    REDACTED

101. Internal emails authored by senior-ranking CUSA officials make clear that Defendants acted deliberately to REDACTED

102. REDACTED (See Exh. 22 hereto)

103. REDACTED

104. Remarkably, the senior-most CUSA official responsible for "Customer Relationship" wrote:

REDACTED

(Id.)(Emphasis added)

105. A series of emails sent and received by other CUSA's officials on August 26, 2005 make clear REDACTED

REDACTED

Another email authored only minutes later states in relevant part:

REDACTED

Finally, another email authored later that afternoon similarly states in relevant part:

REDACTED

(Emphasis added) (See Exhs. 23, 24 and 25 hereto). In addition, testimony provided by CUSA Assistant Manager Mitani also served to confirm that Defendants did not inform owners of the SD LCD Series Cameras of these policy changes.

106. REDACTED (See Exhs. 21 and 26 hereto.)

107. Not all people who purchased defective SD LCD Series Cameras were charged by Defendants to repair these defective products, however. During the recent deposition of Dennis Monk, who is employed as CUSA's Senior Manager of Service Planning, Plaintiffs

26

learned that Defendants treat their employees who experience cracked LCD panels in the SD model cameras very differently than they treat all of Defendants' other customers.

108.    During his deposition Mr. Monk testified that he was the owner of an SD300 model camera, that he had stored his SD300 model camera in his shirt pocket while on a roller coaster ride at an amusement park while on vacation and that, at the conclusion of the roller coaster ride he pulled the camera out of his shirt pocket and noticed that the harness belt on the ride had caused a significant amount of pressure to be applied to the camera while it was stored in his shirt pocket and that the LCD panel on his SD300 model camera had cracked as a result of such pressure.

109.    Mr. Monk then testified that, upon returning to work, he spoke with Mr. Walter Inglesby, who was employed as CUSA's Manager of Technical Support, and informed him of the circumstances under which the LCD panel in Mr. Monk's camera had been cracked.  Mr. Monk testified that, after doing so, Mr. Inglesby had arranged to have Mr. Monk's SD300 Camera repair at no cost to Mr. Monk.  (Monk Tr. 33-34).

110.    When one considers the enormity of the financial burden that would be imposed on Defendants if they were required to repair all of the defective SD LCD Series Cameras at Defendants' expense, it is not difficult to understand why Defendants have continually disavowed the existence of any design defect in the SD LCD Series Cameras and sought to impose the cost of repairing all of the cracked LCD panels for these Cameras on customers.

**Defendants Seek To Avoid Their Responsibility For Repairing,
More Than REDACTED Cameras Equipped With Defective
LCD Panel Assemblies At Defendants' Expense**

111.    REDACTED

i.    REDACTED SD200 model cameras equipped with the defective LCD panel assemblies were introduced into the market and sold to SD Camera Subclass members during the Class Period (see Exh. 27 hereto);

ii.    REDACTED SD300 model cameras equipped with the defective LCD panel assemblies were introduced into the market and sold to SD Camera Subclass members during the Class Period (see Exh. 28 hereto); and

iii.    REDACTED SD400 model cameras equipped with the defective LCD panel assemblies were introduced into the market and sold to SD Camera Subclass members during the Class Period (see Exh. 29 hereto).

112.    In order to fully appreciate the magnitude of the financial burden that Defendants improperly seek to shift onto purchasers of the defective SD LCD Series Cameras one need only consider that Defendants typically charged customers seeking to repair broken LCD panels in their SD model cameras $150 per camera to perform such repairs, plus any applicable tax and shipping charges, thereby resulting in these customers being charged anywhere from $150 to REDACTED for such repairs. Given that, through October of 2005, Defendants had sold approximately REDACTED defective Canon PowerShot SD200, SD300 and SD400 model cameras, and that Defendants had successfully avoided repairing the vast majority of these defective Cameras at a cost ranging from between $150 to REDACTED, per defective Camera. By their actions, Defendants have been able to wrongfully shift the financial burden of

repairing these defective Cameras onto purchasers of the SD LCD Series Cameras in an aggregate amount ranging from REDACTED.

**B.    The SD Memory Card Series Cameras Are Defectively Designed**

**Canon's DIGIC Technology Is Defectively Designed
Because The DIGIC II Chip Contains An SD Card
Read Access Time-Out-Algorithm That is Defective**

**A Primer On DIGIC II Technology**

113.    The DIGIC II chip is a core device in Canon's digital cameras, and is a system comprised of many subsystems as illustrated in Figure 3 below.

Figure 3



114.    The DIGIC II chip comprises the lower layer (or first layer), with the flash memory and SDRAM chips making up the upper layer (or second layer).  Figure 4 summarizes the functions of the DIGIC II chip.

Figure 4



115.     As demonstrated by Figure 4, one of the functions of the DIGIC II chip is memory card control.   Figure 4 reveals some of the assembly details of the DIGIC II chip. Noteworthy, is the integrated flash memory.  The flash memory contains algorithms (also called firmware) that are changeable and allow differences between camera models to be accommodated by changing the firmware.   Other portions of the DIGIC II chip contain specialized circuitry responsible for performing highly integrated processing functions, such as image processing.  Also contained within the DIGIC II chip is specialized circuitry that manages the electrical interface to SD cards (SD card circuitry).  Together, the firmware and the SD card circuitry implement the algorithms for managing SD memory cards (including the read access time-out algorithm).  Canon uses the DIGIC II chip in a number of PowerShot digital cameras, including among others the following camera models: SD200; SD300; SD400; and SD500.

## The Purpose of SD Card Time-Out

116.    It is digital camera design best practice to have a card read access time-out timer built into a camera.  The function of the read access time-out timer is to prevent the user from waiting an indefinite amount of time for a card operation to complete in the presence of a specific failure.  If a specific failure of an SD card occurs without a timer, a camera will appear non-responsive and will not provide the user any feedback as to what is wrong.  With the SD card time-out function, the camera will provide the user with feedback concerning the failed operation.

**SD Card Specifications**

117.    REDACTED

118.    REDACTED

**Access Time Measurement**

119.    An SD cards' understanding of time is derived from a signal pulse train delivered to the card by the camera.  The card, therefore, is dependent upon the host camera for the "clock" signals which it can use to time out its own operations.

120.    During the phase of camera operation in which the card is first "powered on," the camera starts the card identification process.  The camera starts the process by supplying the SD card with a clock (at a rate ranging from REDACTED, called the identification clock rate.  The card will typically be queried for the unique card identification number (contains product serial number, manufacturer, manufacture date, etc.).  The camera should obtain the card specific data (from CSD register) to obtain card specific performance values.  Data obtained from the CSD register is used to compute the maximum access time to ensure proper operation.  Once the camera has the details in the CSD register, it can compute the typical access times and

31

maximum access times for the card. The camera should use the frequency of the operation clock supplied to the card (up to REDACTED) when computing the typical and maximum access times. **This calculation is crucial to determining the time-out value that the camera should use when waiting for an operation to complete.** For example, if the typical access time determined by reading CSD register is 2 milliseconds, then the maximum access time should be 200 milliseconds, based on best design practices [1]

121.    It is digital camera design best practice to establish the time-out value on a digital camera timer in excess of the SD card time-out maximum read out time specification because doing so will ensure reliable operation without negatively impacting normal camera performance.  If a true failure occurs, and the timer value is REDACTED seconds REDACTED, a camera would simply take REDACTED seconds to detect the faulty condition and report it to the user. Only in the case of a truly defective card, will the long time-out value will be noticed.

122.    The SD200, SD300, SD400, SD500 are models in which the SD card time-out time has been set too short. In the case of the SD200, SD300, SD400, SD500, all sold after the SD100, REDACTED (See Exh. 30 hereto). The selection of a time-out value that is exactly at the specification limit is poor camera design practice and results in a defectively designed camera. Because camera design best practice requires that the time-out value be established with sufficient margin, it is necessary to establish a time-out value with sufficient margin REDACTED, to ensure reliable operation of the SD card. REDACTED.

---

[1]      REDACTED

REDACTED

123.    REDACTED. (See Exh. 31 hereto).    Specifically, REDACTED

124.    Significantly, Canon states that REDACTED (See Exh. 31 hereto).

REDACTED

125.    Subsequent Canon camera models, including the SD200, SD300, SD400 and SD500, still experienced the aforementioned time-out problems with some SD cards REDACTED Doing so in light of the knowledge that Canon had gained by its experience with the REDACTED model camera amounted to poor camera design practice and caused each of the SD200, SD300, SD400 and SD500 cameras to be defectively designed.

126.    Accordingly, the Canon DIGIC II chip technology that controls the memory card in Canon camera models SD200, SD300, SD400 and SD500, is defectively designed because the DIGIC II chip contains a SD card read access time time-out-algorithm that does not allow sufficient time for memory card access in the SD200, SD300, SD400 and SD500 model cameras.

127.    In the case of the SD200, SD300, SD400, and SD500 model cameras, although Canon REDACTED Defendants failed to remedy this design defect in approximately REDACTED SD200, SD300, SD400 and SD500 model cameras sold prior to the second half of 2005. (See Exhs. 27 – 29; 32 hereto).

128.    Because Defendants failed to remedy this design defect in these cameras by, for example, REDACTED as purchasers of the SD Memory Card Series Cameras were damaged thereby.

**Defendants Seek To Avoid Their Responsibility For
Repairing Defective SD200, SD300, SD400 and SD500
Cameras REDACTED At Defendants' Expense**

129.    REDACTED

   i.    REDACTED SD200 model cameras equipped with defective DIGIC
II chips were introduced into the market and sold to SD Camera Subclass members
during the Class Period (see Exh. 27 hereto);

   ii.    REDACTED SD300 model cameras equipped with defective DIGIC
II chips were introduced into the market and sold to SD Camera Subclass members
during the Class Period (see Exh. 28 hereto);

   iii.    REDACTED SD400 model cameras equipped with defective DIGIC
II chips were introduced into the market and sold to SD Camera Subclass members
during the Class Period (see Exh. 29 hereto); and

   iv.    REDACTED SD500 model cameras equipped with defective DIGIC
II chips were introduced into the market and sold to SD Camera Subclass members
during the Class Period (see Exh. 32 hereto).

130.    The magnitude of the financial burden that Defendants improperly seek to shift
onto purchasers of the SD Memory Card Series Cameras is able to be determined by considering
the range of charges that Defendants imposed on customers seeking to have their SD200,
SD300, SD400 or SD500 model cameras repaired.  For example, according to internal CUSA
repair charge data produced to Plaintiffs, REDACTED (see Exh. 33 hereto)

131.    Based on the number of defective Cameras sold for each of these models,
Defendants have successfully avoided repairing these Cameras and, by their actions, have been
able to wrongfully shift the financial burden of repairing these defective Cameras onto
purchasers of the SD LCD Series Cameras in an aggregate amount ranging from
REDACTED

## THE E-18 DEFECT CAMERAS

### The E-18 Error Code

132.    In designing and manufacturing Canon's Digital PowerShot camera line, Canon programmed into each of these cameras a series of "error" codes that are designed to appear and alert the users of these products to an error having occurred with the Cameras.  (See Exh. 34 hereto).

133.    Among the "error" codes programmed into the A60, A70 and S400 model PowerShot Digital Cameras was the error code "E18."

134.    According to internal Canon documents, REDACTED (see Ex. 35)

REDACTED

**Certain of the S400 Model Cameras Are Defective and
Defendants Have Long Known Of These Defects But Have
Failed To Act To Remedy These Defects At Defendants' Expense**

135.    REDACTED (see Exh. 36 hereto).

136.    This memorandum states in relevant part:

REDACTED

*         *         *

REDACTED

(Emphasis in original and added).

137.    On July 31, 2003, Messrs. Nakai and Nagumo authored a second memoranda

concerning **REDACTED**  (see Exh. 37)

**Certain of the A60 and A70 Model Cameras Are Defective and
Defendants Have Long Known Of These Defects But Have Failed To Act
To Remedy These Defects At Defendants' Expense**

138.    On July 31, 2003, REDACTED  (see Exh. 38 ).  REDACTED

REDACTED

\*        \*        \*

REDACTED

REDACTED

In this memorandum, these engineers also confirmed that there were approximately

REDACTED defective A60 model Cameras and REDACTED defective model A70

Cameras that were plagued by the E-18 defect.

**Numerous Customer Complaints Serve To Confirm
The Widespread Nature of the E-18 Defect In The E-18 Defect Cameras**

139.    There are numerous complaints from members of the E-18 Defect Subclass

which confirm the existence of the defect in the Cameras' Digital Imaging Integrated Circuit

Processors and widespread occurrence of triggering of the "E18 Error Code" as a result of the

E-18 defect.  For example:

    a.  **My son was born 5 days ago and when I took out the camera (powershot
s400) to take pictures immediately after he was born, I got an E18 error.  I
could not get rid of it.  I tried fresh batteries but still the same error pops up.
Canon asks $175 for a refurbished A410 and $155 for repairing my camera.  I**

used to be a Canon product fan but after this, I'm not anymore. (http://www.engadget.com/entry/1234000887028377/) (emphasis added).

b. "I had an Canon A60 and after about a year and a half, **without warning the lens would not extend and E18 error appeared in the lower left corner of the LCD.**" (http://www.dcresource.com/forums/showthread.php?t=3810&page=2) (emphasis added).

c. "I had my A60 for 15 months. **One day, out of the blue – E18 errors. None of the suggested fixes worked.**" (http://www.dcresource.com/forums/showthread.pho?t=3810&page=17) (emphasis added).

d. "**I'm afraid to say it but my Canon A70 just died. You guessed E18 error message and the lens won't close all the way. I had no idea these cameras had this problem until yesterday when mine died and I started searching the net.** The camera is 14 months old and [C]anon won't do a thing about it, other than charge me $150 to fix it." (http://www.dcresource.com/forums/showthread.php?t=3810&page=2) (emphasis added).

e. "Sounds like there are several people out there like me… Found this thread while searching the web after getting the E18 error on my A70. Had it about 14 months, I still have to check the warranty…**Turned it on, then when I turned it off and it wouldn't retract fully, and then showed the E18 error. Sounds like a real design flaw by Canon to me!**" (http://www.dcresource.com/forums/showthread.php?t=3810&page=9) (emphasis added).

f. "Our Canon S400 was purchased around June 2003 (along with a padded carrying case and extra battery). **Yesterday, after taking a round of indoor shots and short videos, we turned it back on and the lens stopped partway through extending, paused, retracted fully and the screen went black with an 'E18' in the lower left corner. Shortly after this, the camera powered itself off completely…**" (http://www.dcresource.com/forums/showthread.php?t=3810&page=3) (emphasis added).

g. "I had a Canon S400 a gift from friends before my 1 year trip to China. **I had experienced intermittent E18 problems, but was always able to resolve them by turning the camera on/off. Soon after the warranty expired, it stopped working completely (E18).**" (http://www.dcresource.com/forums/showthread.php?t=3810&page=13) (emphasis added).

h. "...Got my IXUS 400 in December 2003, means that I've got my camera for 15 mths, that is 3 months past warranty... E18 error just happened after my Thailand trip, thankfully...**Tried to power up in the camera mode by the lens refuse[d] to advance fully, then the E18 error appears at the lower left corner of the screen, after which it promptly shuts down.**" (http://www.dcresource.com/forums/showthread.php?t=3810&page=9) (emphasis added).

i. "**Well I don't see how it's a myth, I've had an IXUS 400 [since] Christmas and on Friday night it stopped and flashed up E18 on the screen.** The [lens] stuck out and the only way I could get it in was to pull the battery out at the moment [it] readjusted to [it]." (http://www.dcresource.com/forums/showthread.php?t=3810&page=15) (emphasis added).

j. **My Canon s400 is one month shy of two years. I received the dreaded E18 just two days ago.** After reading all of the posts on the web, I will not even bother to contact Canon as I will not pay the going price of about $155 to repair the camera. Very disappointed as I thought I had done all the research. Up until now, I loved the camera, but definitely will not buy another Canon. (http://www.engadget.com/entry/1234000887028377/) (emphasis added).

**Defendants Seek To Avoid Their Responsibility For Repairing The** REDACTED **Defective S400 Model Cameras,** REDACTED **Defective A60 Model Cameras, and** REDACTED **Defective A70 Model Cameras At Defendants' Expense**

140. Documents produced by Defendants confirm that Defendants caused a total of approximately REDACTED defective S400, A60 and A70 model Cameras to be placed into the stream of commerce, and that the break down among models is as follows:

    i. REDACTED defective S400 model cameras were manufactured from the commencement of the Class Period through June 9, 2003 (see Exhs. 36 – 37 hereto);

    ii. REDACTED defective A60 model Cameras were manufactured from the commencement of the Class Period through June 10, 2003 (see Exh. 38 hereto); and

    iii. REDACTED defective A70 model Cameras were manfactured from the commencement of the Class Period through June 10, 2003 (see Exh. 38 hereto);

141.    The magnitude of the financial burden that Defendants improperly seek to shift onto purchasers of the defective S400, A60 and A70 Cameras is able to be determined by considering the range of charges that Defendants imposed on customers seeking to have their defective S400, A60 and A70 model Cameras repaired.  For example, according to internal CUSA repair charge data produced to Plaintiffs, REDACTED (See Exh. 33 hereto)

142.    Based on the number of defective Cameras sold for each of these models, Defendants have successfully avoided repairing these Cameras and, by their actions, have been able to wrongfully shift the financial burden of repairing these defective Cameras onto purchasers of the defective S400, A60 and A70 model Cameras in an aggregate amount ranging from REDACTED

143.    While Defendants have repeatedly heralded that the PowerShot Digital Camera line is one of the best selling lines of digital cameras in the world, and that their customers must be satisfied with the quality of Defendants' products, else why would customers continue to buy them, the 2005 Digital Camera Satisfaction Study published by J.D. Power and Associates on August 16, 2005 sharply disputes Defendants' claims concerning the level of customer satisfaction with Canon's PowerShot Digital camera products – including the approximately REDACTED defective Cameras that are the subject of this action.

144.    The J.D. Power Study, which was received by CUSA and marked as Exhibit 68 during Mr. Hardin's deposition, clearly demonstrates that Defendants' Customer Satisfaction Index Rankings in all four categories were well below average – and in fact, near the very bottom of each index.  Specifically, the survey and attached bar charts indicate that:

(i) Canon ranked 6th out of 9 on the Customer Satisfaction Index Ranking in the "$199 or Less Segment;

(ii) Canon ranked 9th out of 11 on the Customer Satisfaction Index Ranking in the "$200 - $399 Segment;

(iii) Canon ranked 5th out of 5 -- dead last -- on the Customer Satisfaction Index Ranking in the "$400 - $599 Segment; and

(iv) Canon ranked 3rd out of 4 on the Customer Satisfaction Index Ranking in the "$600 or more Segment. (See Exh. 39 hereto)

145. Similarly, documents produced by Defendants during discovery serve to REDACTED admittedly designed, manufactured and sold approximately REDACTED defective PowerShot Digital Cameras out of a total of approximately REDACTED PowerShot Digital Cameras sold for which Defendants have produced documents. Stated another way, approximately REDACTED of these PowerShot Digital Cameras were -- as Defendants' own documents make irrefutably clear -- defective. This fact is well confirmed by the very low Customer Satisfaction ratings for these Cameras as reflected in the J.D. Power and Associates Study.

**Defendant's Motive For Refusing To Repair**
**REDACTED Admittedly Defective Cameras At Defendants' Expense**

146. A May 7, 2005 Canon memo authored by Messrs. Imai and Konishi makes clear

REDACTED

REDACTED

(Emphasis added).

147. Defendant's answer concerning how to reduce service costs is clear. Defendants wrongfully shifted those costs from Defendants onto Class members by wrongfully refusing to repair defective Cameras unless Class members -- rather than Defendants -- paid for such repairs.

40

## COUNT I

**(By Plaintiff Anastasio, individually, and on behalf of all members of the CCD Defect Subclass who purchased their CCD Defect Cameras in Arkansas, California, Colorado, Connecticut, Hawaii, Illinois, Indiana, Iowa, Michigan, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, Oklahoma, Vermont or West Virginia For Unjust Enrichment).**

148.    Plaintiff re-alleges and re-asserts each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

149.    During the Class Period, Defendants designed, manufactured and sold the CCD Defect Cameras, which are defective as a result of the CCD defect (as described herein).

150.    As a result of the CCD defect, members of the CCD Defect Subclass have experienced malfunctions with their CCD sensors.

151.    Defendants had knowledge of the CCD defect in the CCD Defect Cameras prior to the time Plaintiff purchased her Camera as a result of the numerous complaints that they received from customers and on the basis of Defendants' own investigation of the CCD defect.

152.    Despite Defendants' knowledge of the defect in the CCD Defect Cameras, Defendants have refused to inform members of the CCD Defect Subclass that all of the CCD Defect Cameras are defective as a result of the CCD defect -- a material fact-- and/or issue a recall of the CCD Defect Cameras.

153.    During the Class Period, Plaintiff and members of the CCD Defect Subclass conferred upon Defendants, without knowledge of the CCD defect, payment for their CCD Defect Cameras, benefits that were non-gratuitous. These benefits were conferred upon Defendants as a result of Plaintiff and members of the subclass having purchased and paid for the defective Cameras that were designed, manufactured and sold by Defendants. A material portion of these monies paid by Plaintiff and members of the subclass to retailers for the

defective Cameras was ultimately paid to Defendants, who were unjustly enriched as a result thereof.

154.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the CCD Defect Subclass despite Defendants' knowledge of the CCD defect. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and members of the CCD Defect Subclass under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

155.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the CCD Defect Subclass is unjust and inequitable, Defendants must pay restitution in a manner established by the Court.

## COUNT II

**(By Plaintiff Ruark, individually, and on behalf of all similarly situated members of the CCD Defect Subclass who purchased their CCD Defect Cameras in Alaska, District of Columbia, Georgia; Kansas, Kentucky Maine, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Virginia, Washington and Wisconsin For Unjust Enrichment)**

156.    Plaintiff re-alleges and re-asserts each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

157.    During the Class Period, Defendants designed, manufactured and sold the CCD Defect Cameras, which are defective as a result of the CCD defect (as described herein).

158.    As a result of the CCD defect, members of the CCD Defect Subclass have experienced malfunctions with their CCD sensors.

159.    Defendants had knowledge of the CCD defect in the CCD Defect Cameras prior to the time Plaintiff purchased his CCD Defect Camera as a result of the numerous complaints

that they received from customers and on the basis of Defendants' own investigation of the CCD defect.

160.    Despite Defendants' knowledge of the defect in the CCD Defect Cameras, Defendants have refused to inform members of the CCD Defect Subclass that all of the CCD Defect Cameras are defective as a result of the CCD defect – a material fact – and/or issue a recall of the CCD Defect Cameras.

161.    During the Class Period, Plaintiff and members of the CCD Defect Subclass conferred upon Defendants, without knowledge of the CCD defect, payment for their CCD Defect Cameras, benefits that were non-gratuitous. These benefits were conferred upon Defendants as a result of Plaintiff and members of the subclass having purchased and paid for the defective Cameras that were designed, manufactured and sold by Defendants. A material portion of these monies paid by Plaintiff and members of the subclass to retailers for the defective Cameras was ultimately paid to Defendants, who were unjustly enriched as a result thereof.

162.    During the Class Period, Defendants appreciated, or had knowledge of the non-gratuitous benefits conferred upon it by Plaintiff and members of the CCD Defect Subclass.

163.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the CCD Defect Subclass despite Defendants' knowledge of the CCD defect. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and the CCD Defect Subclass under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

164.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the CCD Defect Subclass is unjust and inequitable, Defendants must pay restitution in a manner established by the Court.

## COUNT III

**(By Plaintiffs Masterson and Rosenberg, individually, and on behalf of all members of the SD Defect Subclass who purchased their SD Defect Cameras in Arkansas, California, Colorado, Connecticut, Hawaii, Illinois, Indiana, Iowa, Michigan, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, Oklahoma, Vermont or West Virginia For Unjust Enrichment).**

165.    Plaintiffs reallege and reassert each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

166.    During the Class Period, Defendants designed, manufactured and sold the SD LCD Series Cameras, which are defective as a result of the SD LCD defect (as described herein).

167.    As a result of the SD LCD defect, members of the SD Defect Subclass have experienced cracked LCD screens.

168.    During the Class Period, Defendants designed, manufactured and sold the SD Memory Card Series  Cameras, which are defective as a result of the SD Memory Card defect (as described herein).

169.    As a result of the SD Memory Card defect, members of the SD Defect Subclass have experienced memory time out malfunctions.

170.    Defendants had knowledge of the SD LCD defect at the time Plaintiffs purchased their SD LCD Cameras as a result of the numerous complaints that they received from customers and on the basis of Defendants' own investigation of the SD LCD defect.

171.   Defendants had knowledge of the SD Memory Card defect prior to the time Plaintiffs purchased their SD Memory Card Series Cameras as a result of the numerous complaints that they received from customers on the basis of Defendants' own investigation of the SD Memory Card defect.

172.   Despite Defendants' knowledge of the SD LCD defect and the SD Memory Card defect, Defendants have refused to inform members of the SD Defect Subclass that: (i) all of the SD LCD Series Cameras are defective as a result of the SD LCD defect and (ii) all of the SD Memory Card Series Cameras are defective as a result of the SD Memory Card defect -- material facts-- and/or to issue a recall of the SD Defect Cameras.

173.   During the Class Period, Plaintiffs and members of the SD Defect Subclass conferred upon Defendants, without knowledge of the SD LCD or SD Memory Card defects, payment for their SD Defect Cameras, benefits which were non-gratuitous. These benefits were conferred upon Defendants as a result of Plaintiffs and members of the subclass having purchased and paid for the defective Cameras that were designed, manufactured and sold by Defendants. A material portion of these monies paid by Plaintiffs and members of the subclass to retailers for the defective Cameras was ultimately paid to Defendants, who were unjustly enriched as a result thereof.

174.   Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the SD Defect Subclass despite Defendants' knowledge of the SD LCD and SD Memory Card defects. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the SD Defect Subclass under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

175.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the SD Defect Subclass is unjust and inequitable, Defendants must pay restitution in a manner established by the Court.

## COUNT IV

**(By Plaintiff Rosenberg, individually and on behalf of all those members of the SD Defect Subclass who purchased their SD Cameras in the State of New York for violations of N.Y. General Business Law § 349)**

176.    Plaintiff realleges and reasserts each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

177.    By its conduct, including the non-disclosure of the defects in the SD Defect Cameras, as alleged above, and the continued sale of the defective SD Defect Cameras, Defendants have engaged and continue to engage in deceptive acts and practices in the conduct of business, trade and commerce, and in the furnishing of services within New York State, all in violation of New York General Business Law ("GBL") § 349.

178.    GBL § 349(h) provides in relevant part that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, [and] an action to recover his actual damages."

179.    Plaintiff is a "person who has been injured" by reason of the Defendants' violation of GBL § 349.

180.    The above-referenced deceptive acts and practices, namely selling the defective SD Cameras to Plaintiffs and members of the SD Defect Subclass, and failing to disclose the existence of the defects in the SD Defect Cameras, despite Defendants' knowledge of the defects prior to the time Plaintiff purchased her Camera, have directly and proximately and

forseeably resulted in damages to Plaintiff and members of the SD Defect Subclass, resulting in their costs of purchasing defective SD Defect Cameras.

181.    Plaintiff and members of the SD Defect Subclass are, therefore, entitled to damages in an amount to be determined at trial.

## COUNT V

**(By Plaintiffs Anastasio and Ilyutovich, individually, and on behalf of all members of the E-18 Defect Subclass who purchased their E-18 Defect Cameras in Arkansas, California, Colorado, Connecticut, Hawaii, Illinois, Indiana, Iowa, Michigan, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, Oklahoma, Vermont or West Virginia For Unjust Enrichment).**

182.    Plaintiffs reallege and reassert each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

183.    During the Class Period, Defendants designed, manufactured and sold the E-18 Defect Cameras, which are defective as a result of the E-18 defect (as described herein).

184.    As a result of the E-18 defect, members of the E-18 Defect Subclass have experienced malfunctions with lens retraction.

185.    Defendants had knowledge of the E-18 defect in the E-18 Defect Cameras prior to the time Plaintiffs purchased their E-18 Defect Cameras as a result of the numerous complaints that they received from customers and their investigation of the E-18 defect.

186.    Despite Defendants' knowledge of the defect in the E-18 Defect Cameras, Defendants have refused to inform members of the E-18 Defect Subclass of the E-18 defect -- a material fact-- and/or issue a recall of the E-18 Defect Cameras.

187.    During the Class Period, Plaintiffs and members of the E-18 Defect Subclass conferred upon Defendants, without knowledge of the E-18 defect, payment for their E-18 Defect Cameras, benefits which were non-gratuitous. These benefits were conferred upon

Defendants as a result of Plaintiffs and members of the subclass having purchased and paid for the defective Cameras that were designed, manufactured and sold by Defendants. A material portion of these monies paid by Plaintiffs and members of the subclass to retailers for the defective Cameras was ultimately paid to Defendants, who were unjustly enriched as a result thereof.

188.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the E-18 Defect Subclass despite Defendants' knowledge of the E-18 defect. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the E-18 Defect Subclass under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

189.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the E-18 Defect Subclass is unjust and inequitable, Defendants must pay restitution in a manner established by the Court.

## COUNT VI

**(By Plaintiff Ruark, individually, and on behalf of all similarly situated members of the E-18 Defect Subclass who purchased their E-18 Defect Cameras in Alaska, District of Columbia, Georgia; Kansas, Kentucky Maine, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Virginia, Washington and Wisconsin For Unjust Enrichment)**

190.    Plaintiff realleges and reasserts each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

191.    During the Class Period, Defendants designed, manufactured and sold the E-18 Defect Cameras, which are defective as a result of the E-18 defect (as described herein).

192.    As a result of the E-18 defect, members of the E-18 Defect Subclass have experienced malfunctions with lens retraction.

193.    Defendants had knowledge of the E-18 defect in the E-18 Defect Cameras prior to the time Plaintiff purchased his E-18 Defect Camera as a result of the numerous complaints that they received from customers and their investigation of the E-18 defect.

194.    Despite Defendants' knowledge of the defect in the E-18 Defect Cameras, Defendants have refused to inform members of the E-18 Defect Subclass of the E-18 defect -- a material fact-- and/or issue a recall of the E-18 Defect Cameras.

195.    During the Class Period, Plaintiff and members of the E-18 Defect Subclass conferred upon Defendants, without knowledge of the E-18 defect, payment for their E-18 Defect Cameras, benefits which were non-gratuitous. These benefits were conferred upon Defendants as a result of Plaintiff and members of the subclass having purchased and paid for the defective Cameras that were designed, manufactured and sold by Defendants. A material portion of these monies paid by Plaintiff and members of the subclass to retailers for the defective Cameras was ultimately paid to Defendants, who were unjustly enriched as a result thereof.

196.    During the Class Period, Defendants appreciated, or had knowledge of the non-gratuitous benefits conferred upon it by Plaintiff and members of the E-18 Defect Subclass.

197.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the E-18 Defect Subclass despite Defendants' knowledge of the E-18 defect. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and the E-18 Defect Subclass under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

198.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the E-18 Defect Subclass is unjust and inequitable, Defendants must pay restitution in a manner established by the Court.

## COUNT VII

**(By Plaintiff Ilyutovich, individually, and on behalf of all similarly situated members of the E-18 Defect Subclass who purchased their E-18 Defect Cameras in Alaska, Arkansas, Colorado, Delaware, Hawaii, Iowa, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Virginia, West Virginia, or Wyoming and on behalf of all similarly situated members of the E-18 Subclass who purchased new E-18 Defect Cameras in Texas For Breach of Implied Warranty of Merchantability)**

199.    Plaintiff re-allege and re-assert each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

200.    At all times, there were in effect the following statutes governing the implied warranty of merchantability: Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2-314; CRS § 4-2-314; 6 Del. C. § 2-314; HRS § 490:2-314; Iowa Code § 554.2314; 11 M.R.S.A. § 2-314; Md. Code Ann. Art. 95B § 2-314; Mass. Gen. Laws. Ch. 106 § 2-314; Minn. Stat. § 336.2-314; Miss. Code. Ann. § 75-2-314; MCA 30-2-314; Neb. UCC 2-314; NRS 104.2314; RSA 382-A:2-314; N.J.S.A. 12A:2-314; NDCC 2-314; O.S. 1991 § 2-314; S.C. Code Ann. § 36-2-314; SDCL 57A-2-314; VA. Code § 8.2-314; W. VA. Code § 46-2-314; Wyo. Stat. 34.1-2-314; and Tex. Bus. & Com. Code Ann. § 2-314.

201.    As a manufacturer and seller of the E-18 Defect Cameras, Defendants are "merchants," within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

202.    The E-18 Defect Cameras are "goods," as defined in various states' commercial codes governing the implied warranty of merchantability.

203.    Implied in the sale of the E-18 Defect Cameras is a warranty of merchantability that requires, among other things, that the E-18 Defect Cameras pass without objection in the trade and are fit for the ordinary purposes for which the E-18 Cameras are used.

204.    Because the E-18 Defect Cameras are defective due to the E-18 defect, as demonstrated by the malfunctions of the E-18 Defect Cameras' lens' retraction, the E-18 Defect Cameras are not able to function in their ordinary capacities and, therefore, are not merchantable, as impliedly warranted by Defendants.

205.    Plaintiff Ilyutovich provided Defendant CUSA with notice of the defect in her E-18 Defect Camera in September, 2004.

206.    Any purported disclaimer of the implied warranty of merchantability is invalid.

207.    Any purported limitation on remedies on the part of Defendants fails of its essential purpose.

208.    The E-18 defect in the E-18 Defect Cameras rendered the E-18 Defect Cameras not merchantable and thereby proximately caused Plaintiff and members of the E-18 Defect Subclass to suffer economic damages in an amount to be ascertained at trial.

**WHEREFORE,** Plaintiffs pray that the Court enter judgment and orders in their favor and against Canon as follows:

A.    An order certifying the Class and directing that this case proceed as a class action;

B.    Judgment in favor of Plaintiffs and the members of the Class in an amount of actual damages or restitution to be determined at trial;

C.    An order enjoining Defendants from the further sale of the Cameras;

D.  An order granting reasonable attorneys' fees and costs, as well as pre- and post-judgment interest at the maximum legal rate; and

E.  Such other and further relief as this Court may deem appropriate.

## DEMAND FOR TRIAL BY JURY

The Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Respectfully submitted this 25th day of May, 2006.

ABBEY SPANIER RODD ABRAMS
& PARADIS, LLP

By: _____

Paul O. Paradis (PP 9935)
Gina M. Tufaro (GT 5419)
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

HORWITZ, HORWITZ & ASSOCIATES

By: _____

Richard J. Doherty
James M. Smith
25 East Washington Street
Suite 900
Chicago, Il 60602
Telephone: 312-372-8822

Plaintiffs' Co-Lead Counsel